GREMPLER t/a Donald E. Grempler Realty, Inc. *v.* MULTIPLE LISTING BUREAU OF HARFORD COUNTY, INC., ET AL.

[No. 392, September Term, 1969.]

*Decided June 5, 1970.*

The cause was argued before HAMMOND, C. J., and MC-WILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*John B. Garvey, Jr.,* with whom was *Robert J. Dougherty* on the brief, for appellant.

*Franklin Somes Tyng,* with whom was *Stephen A. Tarrant* on the brief, for appellees.

DIGGES, J., delivered the opinion of the Court.

"The Realtor should so conduct his business as to avoid controversies with his fellow-Real-

tors; but, in the event of a controversy between Realtors who are members of the same real estate board, such controversy should be submitted for arbitration in accordance with regulations of their board and not to a suit at law. The decision in such arbitration, should be accepted as final and binding."

Article 22, Brokers' Code of Ethics.[1]

Ignoring both the spirit and the letter of this directive, a group of realtors in Harford County have brought to court the question of whether a restrictive multiple listing service constitutes an unfair trade practice. The appellant would have done better to follow the code's advice for we must uphold the trial court (Dyer, J.) in finding that the local practice of which she here complains is neither a monopoly nor an unlawful restraint of trade.

Appellant Mary Bell Grempler, trading as Donald E. Grempler Realty, Inc., filed a complaint in the Circuit Court for Harford County, alleging that she is a real estate broker licensed by the State of Maryland and has been the operator of her own business in Towson, Baltimore County, since 1960; that she now operates a branch office for the sale of real estate in Joppatowne, Harford County; that defendant, the Multiple Listing Bureau of Harford County, Inc. (Bureau) and certain of its officers also named as defendants are engaged in the multiple listing system for selling real estate; that appellant has thrice made application to join the Bureau and thrice been rejected; that the rejections conformed to by-laws of the Bureau; that these by-laws are invalid as against public policy and that defendant's continued refusal to admit appellant to membership constitutes a monopoly and an unlawful restraint of trade, causing private harm to her, and harm to the public generally. She prayed for an order compelling the Bureau to admit her, and also sought

---

1. Code of Ethics of the National Association of Real Estate Boards, reproduced in W. Casey, Real Estate Desk Book, 42 (2d ed. 1966).

compensatory and punitive damages. The appellee Bureau responded to the bill with a demurrer which the lower court sustained without leave to amend. From the order dismissing the complaint Grempler appealed to this court.

A demurrer admits the truth of relevant and well-pleaded facts, *Myers v. Montgomery Ward & Co.,* 253 Md. 282, 252 A. 2d 855 (1969), and in this case there is no actual dispute over the facts. Both parties agree that Grempler has her main office in Baltimore County. When she first applied for membership in the Bureau she was rejected on the basis of a by-law which required that she be a member of the Harford County Board of Realtors. Subsequently she was successful in joining the Board and re-applied for membership in the Multiple Listing Bureau. She was again denied membership, this time because a by-law stated

> "participation is limited to Realtor Members whose main office is established within the boundaries of Harford County. This limitation will apply against any Realtor Member, known to be a branch office or affiliate of some organization, whose main office is outside Harford County. Realtor Members participating in any other listing service, listing bureau, or listing group or organization in the State of Maryland, except the Multiple Listing Service of the state-wide association, are not eligible to participate in this Bureau."

She then employed an attorney and made a third attempt to join, which was rebuffed on the identical ground that Grempler's main office was not in Harford County.

Multiple listing is a device used by the real estate broker to give wide exposure to properties listed for sale. Each co-operating broker informs all other participating brokers of the properties listed with him, thus an individual home for sale is available to purchasers at several different brokers' offices. As observed by the court in

*Grillo v. Bd. of Realtors of Plainfield Area,* 91 N. J. Super. 202, 219 A. 2d 635, 644 (1966) :

> "There is good in the multiple listing system. It provides an effective method for selling and buying properties. The seller benefits because his property is exposed in a number of offices, hence reaches a wider market in a shorter period of time. It is also useful and convenient to the prospective buyer who is seeking a house that will suit his needs and purse. From one selling agent he can learn of many of the properties for sale in the area. In effect, the multiple listing service operates as an exchange for the sale of real estate. The multiple listing system can potentially stimulate competition in the real estate field by placing listings in the hands of all brokers in the area."

The broker's fee is apportioned between the listing broker and the selling broker, with the Bureau receiving a small percentage.

Conceding that she does not satisfy the requirements of the by-laws, Grempler nevertheless seeks to compel her admission. She argues that the multiple listing service is a significant trade advantage in the highly competitive real estate field and that the restricted membership of the Bureau constitutes an unlawful restraint of trade under the common law. She also argues that the Bureau is a monopoly prohibited by Article 41 of the Declaration of Rights of the Maryland Constitution which reads "[t]hat monopolies are odious, contrary to the spirit of a free government and the principles of commerce, and ought not to be suffered." This Article has been part of every Maryland Constitution since 1776. There seems to be some question as to whether its ban extends to anything other than monopolies in the strict sense, that is, an exclusive right or privilege granted by the sovereign.[2] We do not

2. "The Court of Appeals has consistently held that this Article prohibits only monopolies granted by the State. It is not a state

resolve that question here, for we believe the concept of "restraint of trade" includes a practical or economic monopoly.

Restraint of trade or unfair competition is a branch of the law of torts with roots deep in the common law. Chafee, *Unfair Competition*, 53 Harv. L. Rev. 1289 (1940). Many states adopted this concept either reflexively by general constitutional provision declaring the common law of England as of July 4, 1776 to be in force, or by specific prohibition against illegal combinations or monopolies; Maryland did both. Articles 5 and 41, Maryland Declaration of Rights. Since the passage of the Sherman Anti-Trust Act (July 2, 1890) 26 Stat. 209 c. 647, 15 USCA sec. 1, 4 FCA title 15, sec. 1, the bulk of unfair competition cases have been decided under federal anti-trust law, and the state law has become of correspondingly less significance. Appellant Grempler claims no violation of the Sherman Act and cases decided under that act are not therefore controlling, but they are highly persuasive because it is recognized that the act incorporates the common law restraint of trade principles. *Apex Hosiery Co. v. Leader*, 310 U. S. 469 (1940); *Levin v. Sinai Hosp. of Balto.*, 186 Md. 174, 46 A. 2d 298 (1946).

Grempler complains that the multiple listing system attracts the great majority of customers in the real estate field, and that by her exclusion from the benefits of that system her competitors in the Bureau acquire an advantage that is unfair. It is fundamental that mere competition by a business rival is not a tortious act; only unreasonable or unfair restraints of trade are proscribed. *Standard Oil Co. v. United States*, 221 U. S. 1 (1911); *United States v. American Tobacco Co.*, 221 U. S. 106 (1911); 1 Harper and James, *The Law of Torts*, sec. 6.13

---

anti-trust law nor would it be adequate for any such purpose." Ninth Report of the Committee on Elective Franchise and Declaration of Rights, Constitutional Convention Commission [of Maryland] October 24, 1966. Compare, however, the definition of constitutional "monopoly" in Wright v. State, 88 Md. 436, 41 A. 795 (1898) with that in Levin v. Sinai Hosp. of Balto., 186 Md. 174, 46 A. 2d 298 (1946).

(1956). On the simplest conceptual level, the law of unfair competition seeks to prevent "people from playing dirty tricks." Rogers, Book Review 39 Yale L.J. 297, 301 (1929). Thus a long line of cases holds that a contract not to compete may be valid and not against public policy if reasonably limited in time and space, so as to effect only a partial restraint. *Savon Gas Stations No. 6, Inc. v. Shell Oil Company,* 203 F. Supp. 529 (D. Md. 1962) aff'd 309 F. 2d 306 (4th Cir. 1962) ; *Griffin v. Guy,* 172 Md. 510, 192 A. 359 (1937) ; *Tolman Laundry v. Walker,* 171 Md. 7, 187 A. 836 (1936) ; *Guerand v. Dandelet,* 32 Md. 561 (1870).

The legal aspects of membership in private associations have been increasingly before the courts. *See* "Developments in the Law, Judicial Control of Actions of Private Associations," 76 Harv. L. Rev. 983 (1963). The expressed rule is that usually a private voluntary organization may accept or refuse members as it chooses, subject only to its own constitution, charter and by-laws. *Baltimore Co. Hosp. v. Md. Hosp.,* 234 Md. 427, 200 A. 2d 39 (1964) ; *Levin v. Sinai Hosp. of Balto., supra.*

Early courts were reluctant to interfere with the internal affairs of voluntary organizations since the individual's freedom to choose his associates was thought superior to any interest of the state in regulating that choice. With the growth of private associations from rather informal beginnings to positions of real economic power, judicial erosion of the principle of non-interference began. Judicial Control of Actions of Private Associations, *supra* at 986-87. It has now reached the point that courts will compel admission to membership in associations when their control over a particular phase of commerce or professional practice has become so dominant, even in a circumscribed locale, that exclusion from membership unduly hinders or obstructs the natural flow of trade. *Associated Press v. United States,* 326 U. S. 1 (1945).

To support the application of this principle to the case at hand Grempler relies on *Grillo v. Bd. of Realtors of*

*Plainfield Area, supra.* There plaintiff was a realtor who had been repeatedly denied membership in his area multiple listing service. Members of the service were forbidden to divulge multiple listed properties to nonmembers and were punished if they did so. The expressed ground for denial of admission at trial was that appellant had violated unspecified ethical standards of the multiple listing board. The New Jersey court found that sanctions for ethical infringements were properly within the province of the state realty board; it held the multiple listing service amounted to a "concerted refusal to deal with plaintiff" with the result that he was unable to carry on his business. The Superior Court there awarded plaintiff damages for his exclusion, and directed the Board to admit him.

The Court in *Grillo* relied on *Falcone v. Middlesex County Medical Soc.*, 34 N. J. 582, 170 A. 2d 791 (1961). This is a leading American case where plaintiff was a doctor who had received part of his medical training at a college of osteopathy. He attended his last year of school at and received his degree from a medical school recognized by the American Medical Association. He passed the medical board examination for New Jersey and received an unrestricted license to practice medicine and surgery in that state. His entire professional practice was medicine and surgery and not osteopathy. He applied for membership in his county medical society and was refused on the basis of an unwritten rule requiring four years attendance at an American Medical Association accredited medical school, a qualification Dr. Falcone admittedly did not meet. The effect of Dr. Falcone's non-membership in the county medical society was to deny him the use of virtually all hospitals in the area. The Court found that denial of membership made it practically impossible to continue the practice of medicine. It said at page 800,

> "When the County Society engages in action which is designed to advance medical science or

elevate professional standards, it should and will be sympathetically supported. When, however, as here, its action has no relation to the advancement of medical science or the elevation of professional standards but runs strongly counter to the public policy of our State and the true interests of justice, it should be stricken down."

This leading American case is also reported at 89 A.L.R.2d 952 (1963) and is followed by an extensive annotation at 964 entitled "Compelling admission to membership in professional association or society."

Both the Falcone case and the annotation carefully analyze the factors important in determining when membership into trade organizations may be compelled, although the particular focus of the annotation is on admission to bar associations and medical societies. Three basic situations are examined. Where membership in a professional association is required by law, as in the case of a unified bar, denial of membership has generally been held reviewable, and if the refusal is found to be unjustified (e.g. in violation of state law or the association's by-laws), membership will be compelled. *State ex rel. Foster v. Washington State Bar Asso.*, 23 Wash. 2d 800, 162 P. 2d 261 (1945). Analogously, when membership is found to be a practical economic necessity, membership may also be compelled. *Falcone v. Middlesex County Medical Soc., supra.* In the absence of the above prerequisites, the annotation summarizes the law thusly,

"Although the courts will compel reinstatement of a member of an association or society who has been wrongfully or arbitrarily expelled, the general rule is that the courts cannot compel admission of an individual into a voluntary association, since membership is a privilege and not a right, and even if a person's application is arbitrarily refused, he is without legal remedy. It appears that the weight of authority

favors the application of the general rule with regard to compelling admission to professional societies or associations also." Annot. 89 A.L.R. 2d at 966.

*Falcone,* utilizing this rule, distinguishes admission into a social or fraternal organization from admission into a professional organization, and when denial of admission unfairly prevents one from following his trade, judicial compulsion may be appropriate. This same rationale is expressed in the *Restatement of Torts,* chapter 37, sections 762 and 765 (1939) which would allow one individual to refuse to deal with another, but imposes greater restrictions when there is a combination or a concerted refusal to deal. The difference is obviously one of degree.

Having stated the rules at length it is now our duty to apply them. Grempler is barred from participating in the Bureau because her main office is not in Harford County. She is not barred from the real estate business and does in fact have an operating branch office there. Grempler alleges that the Bureau amounts to a monopoly, but sets forth no facts which would support such an allegation. At the oral argument before this Court counsel for appellee stated that even though most of the realtors in Harford County were eligible for membership, only a small percentage were in fact members of the multiple listing bureau.[3] This is not a situation where the by-law is aimed at specifically excluding Grempler from membership. See *Group Health Co-op v. King County Medical Soc.,* 39 Wash. 2d 586, 237 P. 2d 737 (1951). Limitations of regional societies to members who are residents of that region, or whose principal place of business is located there, are traditional and common. The cases would indicate that the same kind of geographical limitation here in question is a frequent one in bar association by-laws

---

3. The records of the Maryland Real Estate Commission indicate that of the seventy-two licensed brokers in Harford County, fifty-eight are members of the real estate board (trade organization), but only twelve are associated with the multiple listing bureau.

or indeed a prerequisite for even taking the state bar examination. See Rule Tenth, Rules Governing Registration of Law Students and Admission to the Bar of Maryland (amended to 1970). The most obvious basis for such a by-law is that it insures that an association limited in interest to a particular area may restrict its membership to that area, making the members more directly accountable to that body both ethically and financially. Presumably the concentration of a member's financial interests within the county is precisely the justification for the portion of the Bureau's by-law which requires resignation from other multiple listing services. To be sure this portion has not yet been invoked against Grempler but, hanging like the Sword of Damocles, it is impossible to ignore.

Whether our adoption of all the holdings and reasoning of *Grillo* would be justified under existing Maryland law is unnecessary to decide, because we find that case factually distinguishable from the one at bar. The broker in *Grillo*, like the doctor in *Falcone*, was *unable* to join the organization without the interposition of the court. In our case Grempler virtually concedes she could become a member of the Bureau, but maintains the financial sacrifice required would be ruinous. That we think is a matter of business judgment to be exercised by Grempler, not a matter of law for the courts. It would appear that Grempler has the legal freedom with other Harford County brokers to establish a competing multiple listing service. If it be said that the Bureau by being first on the scene has an edge, there is clear law that even a natural monopoly is not a violation of the anti-trust laws unless it is misused to drive out competition. *American Football League v. National Football League*, 323 F. 2d 124, 131 (4th Cir. 1963).

It should be noted at this point that the purpose of anti-trust and unfair competition laws is to protect the public by healthy competition, not primarily to protect individual plaintiffs. In the related cases of *Riggall v. Washington County Medical Society*, 249 F. 2d 266 (8th

Cir. 1957) and *Elizabeth Hospital, Inc. v. Richardson,* 167 F. Supp. 155 (W.D. Ark. 1958) aff'd 269 F. 2d 167 (8th Cir. 1959), cert. den. 361 U. S. 884 (1959), there were suits against the local medical society seeking to compel membership for plaintiff Riggall, a doctor who was director of the Elizabeth Hospital. There seemed to be no contention that Dr. Riggall was excluded by any by-law. These cases involved claims under federal anti-trust law as well as an Arkansas law, very similar to Maryland's. 167 F. Supp. at 161. Under both state and federal law the courts concluded that plaintiff's complaint in substance was that practice of his profession would have been more profitable if defendants had not deprived him of membership in the county medical society. Because the doctor was not prevented from practicing, and because no public injury such as price-fixing or coercion was alleged it was held no cause of action existed. Similarly, Grempler sets forth no facts which would support her allegation of harm to the public.

We think the Maryland law is in accord with the general principles we have examined. Where unlawful monopolistic power has been found this Court has not hesitated to strike it down. *Raney v. Montgomery County,* 170 Md. 183, 183 A. 548 (1936). But we find the instant case more similar to the situations in *Baltimore Co. Hosp. v. Md. Hosp.,* 234 Md. 427, 200 A. 2d 39 (1964) and *Levin v. Sinai Hosp. of Balto.,* 186 Md. 174, 46 A. 2d 298 (1946). In *Baltimore Co. Hosp.* the hospital was suing to compel the Blue Cross health insurance plan to admit it as a member hospital. The hospital alleged that one-third of all Maryland citizens carried Blue Cross insurance, and denial to it of membership made continued economic survival doubtful. In *Levin,* Levin was a doctor who as a result of a change of his status from a member of the visiting staff to the courtesy staff by the directors of Sinai Hospital, was unable to make the same use of the hospital facilities. In both these cases we affirmed orders which sustained demurrers to the bill of complaint. Both of the refusals appeared to be discretionary,

432

no "cause" having been assigned in either case. In *Levin* at 182 we defined a monopoly within the prohibition of our Declaration of Rights as "a privilege or power to command and control traffic in some commodity, or the operation of a trade or business to the exclusion of others, who otherwise would be at liberty to engage therein, necessarily implying the suppression of competition, and ordinarily causing a restraint of that freedom to engage in trade or commerce which the citizen enjoys by common right." Quoting this definition with approval in *Baltimore Co. Hosp.* at 432 we concluded "Blue Cross has not combined with or conspired with anyone to interfere with, restrain or prevent the Hospital from carrying on its business, although it is true that the Hospital has suffered economically by not being accepted as a member hospital. However, Blue Cross, being a private corporation, has the right to contract with whom it pleases. Its action can not be construed as a restraint of trade . . . ." We find Grempler's position even less favorable than that of the plaintiffs in *Levin* and *Baltimore Co. Hosp.* because the refusal here is not discretionary, but fully in accord with the Bureau's by-laws. Finding the by-law in question unreasonable neither in form nor effect, we shall affirm the lower court's dismissal of the bill of complaint.

*Judgment affirmed. Costs to be paid by the appellant.*